811 A.2d 404

MARK S. SHAW, PLAINTIFF–APPELLANT, v. CITY OF JERSEY CITY, A MUNICIPAL CORPORATION OF THE STATE OF NEW JERSEY; JOHN DOE A (FICTITIOUS NAME FÒR THE DRIVER OF THE JEEP CHEROKEE MOTOR VEHICLE), ELIOPOULOS KONSTANTI; JOHN DOE B (FICTITIOUS NAME FOR THE DRIVER OF THE HONDA MOTOR VEHICLE); MICHELE CASCETTA; ELIZABETH E. RANDALL, COMMISSIONER OF INSURANCE ON BEHALF OF THE UNSATISFIED CLAIM AND JUDGMENT FUND BOARD AND JOHN DOE C–Z (FICTITIOUS NAMES), DEFENDANTS, AND NEW JERSEY MANUFACTURERS INSURANCE COMPANY, DEFENDANT–RESPONDENT.

NEW JERSEY MANUFACTURERS INSURANCE COMPANY, PLAINTIFF–RESPONDENT, v. MARK S. SHAW, DEFENDANT–APPELLANT.

Argued September 9, 2002—Decided December 11, 2002.

568

*John E. Molinari* argued the cause for appellant (*Blume Gold-faden Berkowitz Donnelly Fried & Forte,* attorneys).

*Daniel J. Pomeroy* argued the cause for respondent (*Mortenson and Pomeroy,* attorneys; *Mr. Pomeroy and Karen E. Heller,* on the brief).

The opinion of the Court was delivered by

ZAZZALI, J.

In this appeal we must decide whether a tortfeasor's intentional act may constitute an "accident" within the meaning of New Jersey's uninsured motorist statute, *N.J.S.A.* 17:28–1.1. The courts below relied on this Court's dictum in *Lindstrom v. Hanover Ins. Co.,* 138 *N.J.* 242, 649 *A.*2d 1272 (1994), to hold that *N.J.S.A.* 17:28–1.1 does not extend coverage to an insured injured by a third party's intentional conduct. We conclude, however, consistent with the Legislature's intent in enacting the uninsured motorist statute, as well as the reasonable expectations of the insured, that an injury caused by an intentional act may qualify as an "accident" under *N.J.S.A.* 17:28–1.1. We reverse.

## I

One evening in March of 1997, plaintiff, an undercover police agent for the City of Jersey City, and his partner, Edwin Nazario, sat parked in an unmarked police van on a side street off Jersey Avenue. Plaintiff was on the lookout for stolen cars that automobile thieves frequently stripped at the Avenue's dead end. Shortly after midnight, plaintiff observed two automobiles traveling southbound down Jersey Avenue in the direction of. the dead end. When those vehicles failed to return, plaintiff drove the van to a location approximately halfway between the dead end and plain-

tiff's earlier vantage point. Plaintiff parked there and exited the van. He then displayed his badge and approached the two vehicles on foot. As he drew closer, one of the vehicles, a Jeep, began to drive toward plaintiff at a high rate of speed. Plaintiff drew his gun and pointed it at the vehicle's windshield.

Plaintiff testified at trial that when he realized that the Jeep was not going to stop, he jumped to the left, while the driver of the Jeep swerved in the opposite direction. Officer Nazario's accident report, however, stated that the driver of the Jeep "with disregard to human life deliberately steered for and struck" plaintiff. It is undisputed that the Jeep hit plaintiff, breaking his ankle in three places. The driver fled and was not apprehended.

Although the Jeep was insured, its insurer declined coverage because it had been stolen. Plaintiff had uninsured motorist coverage under his personal policy with New Jersey Manufacturers Insurance Company (NJM) in the amount of $35,000, and was also entitled to $15,000 in uninsured motorist coverage from the City.

Plaintiff filed a complaint seeking to recover from the City, NJM, the owners of the stolen vehicle and the Unsatisfied Claim and Judgment Fund (UCJF) Board. Plaintiff's claims against the City and NJM asserted that because he was struck by a stolen vehicle operated by an unknown person he was entitled to uninsured motorist coverage. NJM responded by filing a declaratory judgment complaint seeking a determination that it was not required to provide coverage under plaintiff's personal automobile insurance policy.

The trial court consolidated those actions and conducted a bench trial. Prior to the trial the City elected not to contest the availability of its uninsured motorist coverage. The court also dismissed plaintiff's claims against the vehicle's owners and the UCJF. The trial court then addressed NJM's denial of uninsured motorist coverage under plaintiff's personal policy.

Plaintiff's policy required in part that NJM

pay compensatory damages which an insured is legally entitled to recover from the owner or operator of an uninsured motor vehicle or underinsured motor vehicle because of:

1. Bodily injury sustained by an insured and caused by an accident. . . .

After hearing plaintiff's testimony, the trial court held that plaintiff was not entitled to recover uninsured motorist benefits from NJM. Regarding itself bound by this Court's dictum in *Lindstrom, supra,* 138 *N.J.* at 249–50, 649 *A.*2d 1272, the trial court found that the intentional conduct of the uninsured tortfeasor caused plaintiff's injury and therefore ruled that no accident occurred. Because plaintiff's NJM policy provided uninsured motorist coverage only in the event of an accident, the trial court entered judgment for NJM.

The Appellate Division affirmed the trial court's decision. *Shaw v. City of Jersey City,* 346 *N.J.Super.* 219, 787 *A.*2d 268 (2002). The panel held that "[u]nlike the claims against the UCJF, claims for which UM coverage applies are limited to those arising from accidental injury or damage." *Id.* at 226, 787 *A.*2d 268. The panel also relied on *Lindstrom, supra,* 138 *N.J.* at 249, 649 *A.*2d 1272, to rule that "the term 'accident' must be viewed from the perspective of the tortfeasor, not the insured," and therefore "does not include intentional conduct." *Shaw, supra,* 346 *N.J.Super.* at 227, 787 *A.*2d 268.

We granted certification. 172 *N.J.* 177, 796 *A.*2d 894 (2002).

## II

The uninsured motorist statute, *N.J.S.A.* 17:28–1.1, serves two purposes. It is designed to "provide maximum remedial protection to the innocent victims of financially irresponsible motorists," *Riccio v. Prudential Prop. & Cas. Ins. Co.,* 108 *N.J.* 493, 503, 531 *A.*2d 717 (1987), and to "reduce the drain on the financially-troubled Unsatisfied Claim and Judgment Fund." *Id.* at 503–04, 531 *A.*2d 717.

Prior to passage of the statute, "[s]tatutory reliance for the direct relief of victims of uninsured motorists was at first placed

solely on the Unsatisfied Claim and Judgment Fund...." *Motor Club of Am. Ins. Co. v. Phillips*, 66 *N.J.* 277, 284, 330 *A.*2d 360 (1974). The UCJF law, *N.J.S.A.* 39:6–61 to –91, "provide[s] a measure of relief for persons who sustain losses or injury inflicted by financially irresponsible or unidentified owners or operators of motor vehicles, where such persons would otherwise be remediless." *Corrigan v. Gassert*, 27 *N.J.* 227, 233, 142 *A.*2d 209 (1958).

In 1968, the Legislature passed the uninsured motorist statute, which mandated that insurers offering automobile liability insurance also offer uninsured motorist protection. *N.J.S.A.* 17:28–1.1. That same act also stated that insureds carrying uninsured motorist coverage were not "qualified persons" able to pursue a claim against the UCJF. *N.J.S.A.* 39:6–62. The Legislature intended this coverage scheme "to give relief to the Fund, which, at that time, was approaching insolvency because of the growing gap between its income and the volume of claims upon it." *Motor Club, supra*, 66 *N.J.* at 284, 330 *A.*2d 360.

Under the current statutory scheme, uninsured motorist coverage is governed by *N.J.S.A.* 17:28–1.1, which requires motor vehicle liability policies to provide coverage up to certain minimums for

> payment of all or part of the sums which the insured ... shall be legally entitled to recover as damages from the operator or owner of an uninsured motor vehicle, or hit and run motor vehicle, as defined in [*N.J.S.A.* 39:6–78] ... because of bodily injury ... sustained by the insured, *caused by accident* and arising out of the ownership, maintenance or use of such uninsured or hit and run motor vehicle....
>
> [*N.J.S.A.* 17:28–1.1a (emphasis added).]

Over the past two decades the courts of this State have disagreed about the meaning of the uninsured motorist statute's requirement that the harm to the injured insured be "caused by accident." In *Sciascia v. Am. Ins. Co.*, 183 *N.J.Super.* 352, 443 *A.*2d 1118 (Law Div.1982), *aff'd o.b.*, 189 *N.J.Super.* 236, 459 *A.*2d 1198 (App.Div.1983), the court extended uninsured motorist coverage to an insured killed by gunshots fired from a moving automobile. It ruled that "[s]o far as uninsured motorist coverage is concerned, the question of whether there was an 'accident' must

be evaluated from the viewpoint of the insured." *Id.* at 356, 443 *A.*2d 1118. The court distinguished between traditional liability insurance, under which "an intentional wrong is not considered to be an accident," and uninsured motorist coverage, under which the tortfeasor's "intent or purpose is immaterial." *Id.* at 355–56, 443 *A.*2d 1118.

This Court first addressed these issues in *Allstate Ins. Co. v. Malec,* 104 *N.J.* 1, 514 *A.*2d 832 (1986). In *Malec,* we characterized as "eminently sound" an Appellate Division opinion that held that "for purposes of PIP benefits the word 'accident' did not exclude intentional occurrences, 'except where the conduct of the injured person was implicated.'" *Id.* at 10, 514 *A.*2d 832 (quoting *Pennsylvania Nat'l Mut. Cas. Ins. Co. v. Estate of Miller,* 185 *N.J.Super.* 183, 187, 447 *A.*2d 1344 (App.Div.1982)). We observed that both uninsured motorist coverage and PIP benefits constitute "first-party coverage designed to compensate [an] injured party." *Ibid.* (citing *Sciascia, supra,* 183 *N.J.Super.* at 357, 443 *A.*2d 1118). Although in *Malec* we did not explicitly hold that the intentional acts of a tortfeasor may qualify as accidents under an uninsured motorist policy, our comparison of PIP and uninsured motorist coverage suggested that conclusion.

In *Lindstrom, supra,* however, this Court revised the approach to uninsured motorist coverage it endorsed in *Malec* and distinguished in dictum between PIP coverage and uninsured motorist coverage. 138 *N.J.* at 249, 649 *A.*2d 1272. We found that "PIP coverage differs from both automobile-liability and uninsured-motorist coverage, neither of which applies to injuries caused by an act that is an accident from the victim's perspective but that is intended by the actor." *Ibid.* We cited *Cerullo v. Allstate Ins. Co.,* 236 *N.J.Super.* 372, 565 *A.*2d 1125 (App.Div.1989), for the proposition that "differences between PIP and uninsured-motorist coverages are traceable to the significantly different needs that each coverage satisfies." *Lindstrom, supra,* 138 *N.J.* at 249, 649 *A.*2d 1272. We also expressly overruled *Sciascia* to the extent that it held that a determination of whether an incident involving an

uninsured motorist constitutes an "accident" must be arrived at from the perspective of the injured insured. *Ibid.*

In *Abraham v. Raso*, 183 *F.*3d 279 (3d Cir.1999), the United States Court of Appeals for the Third Circuit, applying New Jersey law, called into question *Lindstrom's* discussion of uninsured motorist coverage and instead applied the perspective of the injured insured to decide whether an occurrence may qualify as an "accident" that triggers the plaintiff's uninsured motorist coverage. *Id.* at 296–97. The *Abraham* court observed that uninsured motorist coverage "protects an insured from harm caused by other people's acts, and an insured is equally blameless and surprised regardless of whether the tortfeasor acted negligently or intentionally." *Id.* at 298. It further reasoned that "[c]overing the insured [where a harm has resulted from the intentional act of a third-party tortfeasor] does not encourage the insured to commit intentional, wrongful acts and protects the insured from unexpected losses." *Ibid.* We agree with the Third Circuit because we are now persuaded that both objectives of the uninsured motorist statute are served by including the intentional conduct of a tortfeasor within the ambit of uninsured motorist coverage. We consequently set aside the contradictory dictum of *Lindstrom.*

### III

### A

As we have noted, one of the objectives of uninsured motorist coverage is to provide "maximum remedial protection to the innocent victims of financially irresponsible motorists." *Riccio, supra,* 108 *N.J.* at 503, 531 *A.*2d 717. Uninsured motorist coverage protects those "who have had the foresight to protect themselves, and other parties in interest," by providing recourse to insured drivers for incidents caused by the wrongful or tortious acts of uninsured motorists, hit-and-run drivers, or other drivers from whom a recovery is unlikely. 8C Appelman, *Insurance Law and Practice* § 5067.45 (1981). It concerns itself not with indem-

nifying tortfeasors who have caused injury, but instead with ensuring that injured insureds are made whole. *Riccio, supra,* 108 *N.J.* at 504, 531 *A.*2d 717. As one commentator has noted, uninsured motorist statutes

> create a new procedure for recovery, with recovery not against the tortfeasor, but against the injured party's own insurer. Accordingly, UM coverage is not another liability coverage available to the innocent victim, but, rather, it is in the nature of an accident policy, and, as such, provides first-party benefits as opposed to a liability policy which pays third-party benefits.
>
> [9 *Couch on Ins.* § 122:5 (3d ed.1997).]

Thus, whether the uninsured tortfeasor acted intentionally does not control the availability of uninsured motorist coverage, which pays benefits directly to the injured insured. The intentional acts of the tortfeasor are relevant only to justify a denial of third-party liability coverage under an intentional acts exclusion or clause of similar import in a liability policy applicable to the "uninsured motor vehicle." It matters not to the definition of "uninsured motor vehicle" whether the tortfeasor has no insurance at all, the tortfeasor's insurer denies coverage pursuant to an exclusionary clause in the policy, or the tortfeasor's insurer is insolvent and unable to pay. *N.J.S.A.* 17:28–1.1e(2).

When an insurer denies third-party liability coverage for whatever reason, "precisely the same situation exists ... as if no insurance had been carried at all." 8C Appelman, *supra,* at § 5076.15. In either scenario, third-party coverage is unavailing and an injured victim must resort to available first-party remedies, including uninsured motorist coverage, for relief. Although an intentional tort may cause a third-party insurer to deny coverage to the detriment of an injured party, that denial also cannot limit the availability of the injured party's first-party coverage. Extending uninsured motorist coverage irrespective of whether the insured's injury was caused by an intentional act maximizes the scope of the protection available under *N.J.S.A.* 17:28–1.1, thereby giving effect to its legislative intent.

## B

As noted, the Legislature also intended that uninsured motorist coverage "reduce the drain on the financially-troubled Unsatisfied Claim and Judgment Fund." *Riccio, supra,* 108 *N.J.* at 503–04, 531 *A.*2d 717. To this end the UCJF law, *N.J.S.A.* 39:6–61 to 91, now provides that a "qualified person" who files a claim against the UCJF cannot be "insured under a policy provision providing coverage for damages sustained by the insured as a result of the operation of an uninsured motor vehicle. . . ." *N.J.S.A.* 39:6–62. This provision effectively forecloses insureds possessing uninsured motorist coverage from recovering against the UCJF. In effect, the Legislature has created a parallel remedial scheme, with those insureds possessing uninsured motorist coverage required to recover pursuant to *N.J.S.A.* 17:28–1.1, and those who do not possess uninsured motorist coverage permitted to recover from the UCJF.

Because uninsured motorist coverage was implemented to provide relief to the UCJF, to construe the term "accident" more restrictively under the uninsured motorist statute than under the UCJF would defeat the Legislature's intent. *See Kenny v. N.J. Mfrs. Ins. Co.,* 328 *N.J.Super.* 403, 408, 746 *A.*2d 57 (App.Div. 2000). *See also Gorton v. Reliance Ins. Co.,* 77 *N.J.* 563, 572, 391 *A.*2d 1219 (1978) (holding that term "uninsured automobile" previously found in uninsured motorist statute must be read to have same definition as "uninsured motor vehicle" in UCJF Law because purpose of uninsured motorist statute was to relieve burden on UCJF).

Our courts have held that a qualified claimant may proceed against the UCJF irrespective of whether her injuries were caused by the intentional act of a third party. *See Proskurnja v. Elder,* 73 *N.J.Super.* 466, 473, 180 *A.*2d 200 (Law Div.1962), *Obst v. State Farm Mut. Auto. Ins. Co.,* 123 *N.J.Super.* 60, 67, 301 *A.*2d 469 (Ch.Div.1973), *aff'd o.b.,* 127 *N.J.Super.* 458, 317 *A.*2d 759 (App.Div.1974) ("The Fund does not distinguish between intentional and nonintentional torts."). Those cases have treated the

UCJF claim as a first-party action to which the state of mind of the tortfeasor is irrelevant. The validity of the claim is not dependent on whether the tortfeasor would have been entitled to coverage had he or she had a liability policy applicable to the vehicle involved.

Because the legislative history and purpose of the uninsured motorist statute favor an interpretation that extends the same protections under uninsured motorist insurance as are available under the UCJF, and because claimants may recover from the UCJF for injuries resulting from intentional acts, we hold that the requirement set forth in *N.J.S.A.* 17:28–1.1 that an insured's injury be "caused by accident" does not preclude an injured insured from seeking first-party relief under his or her own policy of uninsured motorist insurance for injuries caused by the intentional acts of third parties. Our holding today furthers the legislative design of *N.J.S.A.* 17:28–1.1 by requiring that courts treat persons carrying statutorily-required uninsured motorist coverage at least as well as those who lack such coverage and consequently must resort to the UCJF for compensation.

### C

Aside from those considerations unique to *N.J.S.A.* 17:28–1.1, general principles of insurance law also dictate our result. Insurance contracts typically are contracts of adhesion, prepared unilaterally by the insurer. *Sparks v. St. Paul Ins. Co.*, 100 *N.J.* 325, 335, 495 *A.*2d 406 (1985). Courts must therefore "assume a particularly vigilant role in ensuring their conformity to public policy and principles of fairness." *Voorhees v. Preferred Mut. Ins. Co.*, 128 *N.J.* 165, 175, 607 *A.*2d 1255 (1992).

Members of the public who purchase insurance policies are entitled to a "broad measure of protection necessary to fulfill their reasonable expectations." *Kievit v. Loyal Protective Life Ins. Co.*, 34 *N.J.* 475, 482, 170 *A.*2d 22 (1961). To the extent that the term "accident" in the context of uninsured motorist coverage is ambiguous, construing it to include intentional acts committed

against an innocent insured satisfies those reasonable expectations. We agree with the Montana Supreme Court's observation that "the average insured reasonably expects that, so long as an injury-causing event is unforeseen and unprovoked by the insured, injuries caused by uninsured motorists will be covered by UM coverage regardless of whether they were caused negligently or intentionally." *Wendell v. State Farm Mut. Auto. Ins. Co.*, 293 *Mont.* 140, 974 *P.*2d 623, 635 (1999). Nothing in the language of plaintiff's uninsured motorist policy suggests to the policy purchaser that coverage for a "bodily injury sustained by an insured and caused by an accident" is contingent on the state of mind of a third party. The insured plaintiff has paid a premium and is entitled to be protected to the extent of his reasonable understanding of the terms of his insurance policy. This result is consistent with a majority of jurisdictions that have addressed the issue of whether an intentional act may qualify as an "accident" for purposes of uninsured motorist coverage. *Id.* at 629–30 (citing jurisdictions that have adopted majority approach).

## IV

■ Applying our holding that uninsured motorist coverage extends to injuries caused by the intentional acts of a tortfeasor, we conclude that when plaintiff was struck by the stolen Jeep an "accident" occurred within the meaning of his uninsured motorist policy. This result is consistent with both legislative design and the reasonable expectations of plaintiff.

We recognize that in appropriate circumstances coverage may be withheld when injury to the insured results from his or her own intentional or negligent actions. On this record, however, there is nothing to suggest that plaintiff materially contributed to the infliction of his injury. We therefore reverse and remand to the trial court for an entry of judgment for plaintiff in accordance with this opinion.

VERNIERO, J., dissenting.

This case is not about an uninsured motorist whose car accidentally collided with an unsuspecting pedestrian. Rather, as the trial court explicitly found, it is about a perpetrator who escaped arrest by using an automobile as an instrument to injure a police officer acting in pursuit of the perpetrator himself. The trial court's finding was consistent with an investigative report filed by the officer's partner, an eyewitness to the incident. That report indicates that "[t]he driver ... with disregard to human life deliberately steered for and struck [the officer] sending him to the ground as he attempted to seek cover."

On those facts, I do not believe that the trial court erred in following this Court's dictum in *Lindstrom v. Hanover Ins. Co.* that courts must view uninsured-motorist (UM) coverage from the perspective of the uninsured tortfeasor. 138 *N.J.* 242, 249, 649 *A.*2d 1272 (1994). Assume for the moment, however, that it did. In an alternate portion of its ruling, the trial court also considered events from the perspective of the officer, the injured plaintiff. The trial court explained:

> From the testimony of Shaw and taking into account the narrative of the event in question as is contained in the police reports (J3EVD), I find as a fact that the incident causing Shaw's injury was not an "accident" within the contemplation of the applicable law or the NJM policy (P2EVD) such as would entitle him to recover UM benefits. *Moreover, even if considered from the perspective of plaintiff, I find that Shaw's injury was caused by the clearly intentional conduct of the uninsured tortfeasor who tried to run Shaw down so as to escape arrest.* Accordingly, it is my determination that plaintiff Shaw is not entitled to recover UM benefits from NJM because Shaw did not sustain an injury caused by an "accident" involving an uninsured vehicle, which is the predicate, according to the policy language, for such recovery.
>
> [ (Emphasis added).]

Thus, the trial court explicitly found that plaintiff's assailant intentionally caused plaintiff's injuries. Adopting either the motorist's or victim's perspective, the trial court was satisfied that no accident had occurred. (I acknowledge that under the majority's approach the intentional aspects of a tortfeasor's conduct are of no moment to a victim. Because I would adhere to *Lindstrom,* the

trial court's findings in that regard are still relevant to my analysis.)

Writing for the unanimous panel below, Judge Lintner correctly stated: "Applying ... principles [of appellate review], we are satisfied from our review of the evidence that [the trial court's] finding, that plaintiff's injuries were caused by intentional conduct when an uninsured hit-and-run driver tried to run him down in order to effectuate his escape, is unassailable." *Shaw v. City of Jersey City,* 346 *N.J.Super.* 219, 232–33, 787 *A.*2d 268 (App.Div. 2002). I would follow those basic tenets that require us in these circumstances to accept the trial court's determination. See *State v. Locurto,* 157 *N.J.* 463, 471, 724 *A.*2d 234 (1999) (observing that appellate court cannot disturb lower court's finding that "could reasonably have been reached on sufficient credible evidence present in the record") (internal quotation marks and citation omitted).

The analogy to the Unsatisfied Claim and Judgment Fund (UCJF or Fund) is imperfect and, in my view, unpersuasive. "Accident" under the UCJF merely denotes a procedural term or timing mechanism, *e.g.*, that a claim under the Fund must be filed "within 90 days after the accident." *N.J.S.A.* 39:6–65. The Fund's substantive provision does not refer to "accident" at all, requiring only that the injury "arises out of the ownership, maintenance or use of a motor vehicle[.]" *N.J.S.A.* 39:6–78. In contrast, the UM statute requires as a claim element that a claimant's injuries be "caused by accident[.]" *N.J.S.A.* 17:28.1.1a. Those textual distinctions are critical. They evince a legislative intent, more fully described in *Lindstrom* and by the Appellate Division in this case, to exclude recovery for intentionally-inflicted injuries in the UM context.

Although I agree with the majority that the Legislature designed the UM endorsement to unburden the UCJF, I remain unconvinced that lawmakers intended to provide the type of remedy sought here. Courts have declined to read "accident" into the UCJF's substantive provision, instead allowing recovery for

intentional torts. *Proskurnja v. Elder,* 73 *N.J.Super.* 466, 476, 180 *A.*2d 200 (Law Div.1962) (refusing to impose Fund restrictions not expressly contained in statute). Declining to draw a restrictive inference in the UCJF context, however, is not the same as declining to enforce a plainly-written limitation, such as the one evident in the UM statute. The differences in language between the UM and Fund provisions are sufficient to warrant our affirming the judgments below.

Without question, a police officer injured in the line of duty is entitled to compensation and relief. In that regard, plaintiff received a workers' compensation award arising from his injuries. See *Allstate Ins. Co. v. Malec,* 104 *N.J.* 1, 13, 514 *A.*2d 832 (1986) (observing that when automobile insurance coverage is denied to claimant, system often provides "other sources of recovery, such as ... workers' compensation benefits"). Absent a clearer statement by the Legislature, I would not engraft onto the present system an ability to recover under the UM statute when the underlying conduct unquestionably is intentional in nature.

As an alternate basis for the Court's holding, the majority cites the doctrine of reasonable expectations. Generally, that doctrine becomes relevant when an insured's policy contains ambiguous language. See *Zacarias v. Allstate Ins. Co.,* 168 *N.J.* 590, 595, 775 *A.*2d 1262 (2001) (stating that courts rely on expectations of insured "[w]hen there is ambiguity in an insurance contract"). Briefly put, I would not invoke the doctrine because "accident" is unambiguous when considered in the ordinary sense of that term and through the prism of simple common sense. *Ibid.* (observing that "[i]n the first instance, the words of an insurance policy are to be given their plain, ordinary meaning").

One way to resolve this dispute is to view the incident from neither party's perspective, but rather, as suggested above, to consider whether it was an "accident" within the commonly-understood meaning of that term. The Supreme Court of Washington essentially adopted that approach in *Roller v. Stonewall,* 115 *Wash.*2d 679, 801 *P.*2d 207 (1990). The court stated, "[a] loss

is accidental when it occurs without design, intent, or obvious motivation." *Id.* at 210 (citation and quotation marks omitted). It added: "Thus, the perspective of the insured as opposed to the tortfeasor is not a relevant inquiry. Either an incident is an accident or not." *Ibid.*

After today's holding declaring that a perpetrator's attempt to run down a police officer constituted an "accident" under the UM law, I have difficulty discerning any future fact pattern that would not be subject to the same determination. This Court once warned, albeit within the context of personal injury protection (PIP), "that section four [of the PIP statute], however broad its protection for injuries substantially related to the use of an automobile, is not designed to function as general crime insurance." *Lindstrom, supra,* 138 *N.J.* at 253, 649 *A.*2d 1272. I believe that the same is true of the UM statute.

One final point. That New Jersey has struggled with the high costs of automobile insurance is no secret. *See, e.g., In re Am. Reliance Ins. Co.,* 251 *N.J.Super.* 541, 545, 598 *A.*2d 1219 (App. Div.1991) (tracing history of this State's "intractable" insurance problems), *certif. denied,* 127 *N.J.* 556, 606 *A.*2d 369 (1992). Given that reality, I would exercise restraint before overruling that portion of *Lindstrom* that has been on the books for nearly a decade without objection from the Legislature. I adhere to a prior sentiment: "The Legislature has spoken time and again on the issue of insurance reform. Perhaps it is time for another look; if so, lawmakers, not judges, must drive any effort to revise the statute." *Aponte–Correa v. Allstate Ins. Co.,* 162 *N.J.* 318, 343, 744 *A.*2d 175 (2000) (Verniero, J., dissenting).

To summarize: In a noble effort to interpret the term "accident" with all favorable inferences to the insured, the Court effectively has written that term out of the UM statute. I would affirm the dictum, carefully expressed in *Lindstrom, supra,* that UM coverage does not apply "to injuries caused by an act that is an accident from the victim's perspective but that is intended by the actor." 138 *N.J.* at 249, 649 *A.*2d 1272. I would not disturb

the trial court's finding, based on testimonial and documentary evidence, that from either the tortfeasor's or victim's perspective, plaintiff did not sustain an injury "caused by accident" for purposes of UM coverage. For the above reasons, as well as for those expressed in Judge Lintner's meticulous and persuasive opinion, I would affirm the Appellate Division's judgment in all respects.

*For reversal and remandment*—Chief Justice PORITZ and Justices COLEMAN, LONG, LaVECCHIA, ZAZZALI and PRESSLER—6.

*For affirmance*—Justice VERNIERO—1.